KING, Circuit Judge,
dissenting:
A Virginia criminal statute forbids carnal knowledge of a child thirteen or fourteen years old, “without the use of force” on the part of the offender. See Va.Code § 18.2-63. Not long ago, we determined that this statutory offense is not, for federal sentencing purposes, a violent felony. See United States v. Thornton, 554 F.3d 443 (4th Cir.2009). Jane Doe was convicted of the offense in 1993, for which she was actually incarcerated a grand total of thirty days. Fifteen years later, in 2008, without further wrongdoing on her part, the Commonwealth statutorily reclassified Ms. Doe’s 1993 conviction as one for a “[sjexually violent offense.” Va.Code § 9.1-902(E)(1).
On June 25, 2010, Ms. Doe filed this § 1983 action seeking declaratory and in-junctive relief, and alleging in no uncertain terms that “/bjecause of her 2008 reclassification, [she] ... is prohibited from ‘entering and being present, during school hours and during school-related and school-sponsored activities’ on any property that is a public or private school.” Complaint ¶ 16 (emphasis added) (paraphrasing Va.Code § 18.2-370.5(A)). The prohibition applies to “[e]very adult who is convicted of a sexually violent offense,” with a violation “punishable as a Class 6 felony.” Va.Code § 18.2-370.5(A), (D).
Ms. Doe elaborates that she “has two biological minor children, James Doe, age four, and Judy Doe, age two, and one minor stepchild who is under her care and *764 control, John Doe, age nine.” Complaint ¶ 20. Before being reclassified, Ms. Doe “was involved in John Doe’s education at private and public schools in the Commonwealth of Virginia, including attending parent-teacher conferences and school activities.” Id. Following her 2008 reclassification, however, Ms. Doe has not set foot on school property. See id. Apart from no longer being able to attend school conferences or John’s extracurricular events, Ms. Doe cannot drive John to school when he misses the school bus or pick him up when he needs to leave early because of illness or medical appointments, see id. at ¶¶ 24-26, a state of affairs that, she insists, will compel her “to home school James Doe and Judy Doe, contrary to her preference that they attend public school.” Id. at ¶ 31.
To briefly recap, then, Ms. Doe has alleged (1) state action, in the form of a specific legislative enactment, that (2) is interfering — and will continue to interfere — with her prerogative to have her children educated in the manner that she sees fit. In Meyer v. Nebraska, the Supreme Court long ago acknowledged “the natural duty of the parent to give his [or her] children education suitable to their station in life.” 262 U.S. 390, 400, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The Court identified the discharge of this duty as a “fundamental right] ],” id. at 401, 43 S.Ct. 625, nestled within those liberties protected by the substantive due process component of the Fourteenth Amendment, none of which may “be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect,” id. at 400, 43 S.Ct. 625.
Armed with our decision in Thornton, Ms. Doe appears well positioned to argue her entitlement to § 1983 relief. The notion that Virginia could recast Ms. Doe as a violent offender for being convicted of a non-violent offense does, after all, seem counterintuitive; the legislative action taken by the Commonwealth could plausibly be portrayed as arbitrary and unreasonable. My fine colleagues in the majority, however, have stonewalled Ms. Doe at the courthouse door, concluding that she lacks standing to pursue her substantive due process claim, and that, were it otherwise, the claim would yet be unripe for adjudication. The majority can defend its startling decision only by refusing to acknowledge that the starting point for Ms. Doe’s federal challenge is the state statute that reclassified her, and not the means afforded by the Commonwealth to escape some of the consequences of that reclassification.
The majority makes no effort to conceal that its determination with respect to standing and ripeness rests solely on its observation that Ms. Doe has not petitioned the county circuit court or local school board to secure relief from the entry bar. The majority’s insistence that Ms. Doe avail herself of state recourse as a necessary precursor to federal adjudication of her constitutional claim represents an unprecedented abdication of our judicial role, and its holding today is directly contrary to Patsy v. Board of Regents of the State of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Patsy was a civil rights action alleging reverse discrimination in employment, in which the defendant state entity contended that it should be afforded the threshold opportunity to address and resolve the plaintiffs claim. The Supreme Court vigorously disagreed, revisiting established precedent to demonstrate that it had “on numerous occasions rejected the argument that a § 1983 action should be dismissed where the plaintiff has not exhausted state administrative remedies.” Id. at 500, 102 S.Ct. 2557 (citations omitted).
*765 The majority pays little heed to Patsy, and it offers no justification for its neglect. The justiciability doctrines of standing and ripeness, though closely related to each other, are readily distinguishable from the procedural prerequisite of exhaustion. Following the misbegotten lead of the district court, the majority has erroneously cloaked a procedural exhaustion question (and not much of one at that) in the guise of substantive justiciability, a concept alien and irrelevant to the facts at hand. As explained in more detail below, I would invoke Patsy and its progeny to reverse the district court’s judgment with respect to Ms. Doe’s substantive due process claim, remanding for discovery on her allegations of constitutional injury. Because the majority’s decision represents a radical departure from binding precedent, I respectfully dissent.
I.
A.
Ms. Doe straightforwardly contends that she has been unlawfully barred from her stepson’s school and daycare facility. The majority admits as much: “[S]he does not allege harm merely from being placed on the [offender] Registry, but rather from the consequences her categorization entails for her ability to access school ... property.” Ante at 754. Indeed, the majority elsewhere acknowledges the gravamen of Ms. Doe’s primary claim: “[0]ne may read her complaint as alleging that she is harmed by not being able to enter the school at all.” Id. at 757. The majority’s plain statements of Ms. Doe’s case belie its caterwaul that her substantive due process claim “suffers from a lack of specificity and concreteness that makes it unsuitable for determination by this court.” Id. at 754.
The majority correctly derives from the Complaint “that the injury she alleges arises from an outright denial of her ability to enter school property.” Ante at 754. It asserts, however, that Ms. Doe has abandoned this contention on appeal by maintaining instead that her injury has arisen “from the lack of a policy by which she could petition for entry to the school anonymously.” Id. Although Ms. Doe has, without question, urged our attention to the supposed defects in the school board’s policy, and in particular the anonymous-petition aspect, she has done so as part and parcel of her subordinate procedural due process claim. See Complaint ¶45.
Ms. Doe’s supposed emphasis on the procedure provided by the Commonwealth to procure an exception to the statutory entry bar cannot be interpreted to suggest that she has surrendered her substantive due process claim, which, through repeated mention to this Court, remains alive and well on appeal. For example: “[Virginia’s statutory] scheme denies her entry on school grounds ... because her offense was redefined fifteen years after the case was over.” Br. of Appellant 19. Again: “[T]hat Jane Doe has not applied to the School Board for permission to enter school grounds ... does not excuse the statutory scheme’s ... unconstitutionality.” Id. And again: “Jane Doe’s suit sought to challenge the constitutional validity of the limits placed on her parenting by the statutory scheme and School Board policy.” Id. at 29 (emphasis added). Once more: “The district court also never addressed whether the statutory scheme was narrowly tailored, which is part of Jane Doe’s claim.” Id. at 31. Finally, right off the bat at the argument of this matter, counsel for Ms. Doe explained the foundation of his Ghent’s grievance:
Fifteen years later, Virginia decides that they’re going to classify her as a violent sexual offender, based on the status of her case — nothing to do with her or the facts of her case or anything else.... *766 And the offense at the time was nonviolent in its own definition. The consequence of that is that there are restrictions on her for life.
Oral Argument at 1:04, Doe v. Va. Dept. of State Police (No. 11-1841), available at http://www.cai.uscourts.gov/OAaudiotop. htm.
The “statutory scheme” to which Ms. Doe repeatedly refers no doubt encompasses those discrete provisions requiring her lifetime registration, excluding her from school property, and establishing a procedure to permit her reentry. But it also surely includes Virginia Code section 9.1-902(E)(1), which reclassified her at the threshold as a violent offender and brought each of the aforesaid provisions into play. Although the majority professes, in quite conclusory terms, that Ms. Doe’s substantive due process claim “suffers from a lack of specificity and concreteness,” ante at 754, the irony is palpable: it can point to no specific and concrete reason why that is so.[1]
B.
1.
The impetus driving the majority’s deci-sionmaking is no mystery; the basis therefor is readily discerned from its discussion. Ms. Doe’s substantive due process claim is nonjusticiable, declares the majority, “because she has not yet attempted to undertake the requisite steps to access these properties.” Ante at 750 (emphasis added). According to the majority, the “consequences” to which it refers, suffered by Ms. Doe as the direct result of her reclassification, “do not affect her with finality, as she has not taken any of the steps necessary to access those properties.” Id. at 754 (emphasis added). The majority thus determines that Ms. Doe lacks standing to sue, and it concludes further that “[bjecause Doe has yet to petition a Virginia circuit court for permission to enter school ... property, all of her constitutional claims except [her procedural due process claim against the State Police Superintendent] are dependent on future uncertainties and thus not ripe for judicial decision.” Id. at 759 (emphasis added). Thus, the majority surmises that “it would appear that were Doe to petition a Virginia circuit court, the traceability, redressability, and ripeness concerns we have noted here would be addressed.” Id. at 759 (emphasis added).
The fatal flaw in the majority’s reasoning is that Patsy v. Board of Regents of the *767 State of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), specifically prohibits interposing any administrative exhaustion requirement — such as petitioning a school board — as a roadblock to seeking resolution of a constitutional claim in a federal court. And while “state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States,” Tafflin v. Levitt, 493 U.S. 455, 458-59, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) (citations omitted), those courts’ concurrent jurisdiction of § 1983 actions has never been construed, expressly or impliedly, as conferring upon them exclusive or preferential domain. Hence, though I have no quarrel with the majority’s presumption that the Virginia courts are “competent, reasonable, and fair,” ante at 753, that is quite beside the point. It has always been the case that, when it comes to choosing from among available fora, “the plaintiff is the master of the complaint.” Lincoln Prop. Co. v. Roche, 546 U.S. 81, 91, 126 S.Ct. 606, 163 L.Ed.2d 415 (2005) (citation and internal quotation marks omitted).
Exceptions to the rule in Patsy have subsequently been identified, but none of them applies here. The most significant development in the law occurred in Ohio Civil Rights Commission v. Dayton Christian Schools, Inc., 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), in which the Supreme Court invoked the abstention doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), to deny federal court access to a faith-based school seeking to enjoin the advancement of an administrative inquiry instituted by a state agency charged with investigating and punishing employment discrimination.
The Court distinguished the coercive proceedings at issue in Ohio Civil Rights Commission from those in Patsy, in which the plaintiff had sought recourse in the federal courts strictly to remedy the alleged discrimination against her. See Ohio Civil Rights Comm’n, 477 U.S. at 627 n. 2, 106 S.Ct. 2718. In Moore v. City of Asheville, 396 F.3d 385 (4th Cir.2005), we acknowledged the general rule that “claimants bringing suit in federal court under 42 U.S.C. § 1983 need not exhaust their administrative remedies,” while noting the Supreme Court’s exception for “pending state administrative proceedings that are coercive in nature.” Id. at 395 n. 4 (citing Patsy and Ohio Civil Rights Comm’n).[2]
We affirmed in Moore the district court’s reliance on Younger abstention to forestall federal intervention prior to final resolution of coercive state criminal proceedings against the plaintiff. Notwithstanding that no such proceedings were technically pending — the plaintiff had been issued citations and paid the fines assessed thereon, but had foregone appeal beyond the initial stage — -we determined the plaintiffs situation to be the functional equivalent of that in Ohio Civil Rights Commission, and we remanded for dismissal of his complaint. See Moore, 396 F.3d at 395-96 (“We find the rationale behind the Court’s holding ... equally applicable where the administrative proceedings are no longer pending because of the plaintiffs failure to *768 exhaust his administrative appellate remedies.”).
Here, the majority faults Ms. Doe for declining to pursue what it considers the mandatory administrative course of filing a petition with the school board to set aside the entry bar. In so doing, the majority overlooks that a nonexistent proceeding could hardly be “pending” for abstention purposes. Further, seeking the school board’s largesse as prescribed by the majority is patently a remedial proceeding squarely within the ambit of Patsy, and not in the nature of a punitive, coercive proceeding that would be governed by Ohio Civil Rights Commission. Finally, Ms. Doe’s case is not at all like Moore, in that she has never acquiesced in, then opted out of, a state administrative regimen. I cannot emphasize enough that the majority has charted a new course with its decision today, one that infects with uncertainty any and all potential § 1983 actions in this circuit where any state actor in the decision-making chain arguably provides resort to even a cursory dispute resolution process.
2.
The majority ventures that Patsy has no application here, positing that compelling Doe to “seek permission from state entities prior to bringing suit in federal court does not amount to requiring exhaustion of state remedies for her constitutional claims.” Ante at 754 n. 5. With all respect to the majority, “seekfing] permission from state entities prior to bringing suit in federal court” precisely describes— to a “T” — the concept of exhaustion. According to the majority, Ms. Doe is required to submit to the authority of the school board before she can be considered to have suffered a “final” injury. Id. The majority relates that finality cannot exist until “ ‘the initial decision-maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury.’ ” Id. (quoting Williamson Cnty. Reg’l Planning Comm’n v. Hamilton Bank of Johnson City, 473 U.S. 172, 193, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)).[3]
*769 The majority’s general statement of the law — correct as far as it goes — begs two questions. First, who was this “initial de-cisionmaker” that needed to arrive at a definitive position? And second, what was “the issue” that needed to have been definitively decided? In this case, the initial decision-maker was the Virginia General Assembly, which passed a law that is alleged to have inflicted actual and concrete injury on Ms. Doe. The issue before the legislature, which it answered in the affirmative, was whether a person previously convicted of the Commonwealth’s carnal knowledge offense who was more than five years older than his or her victim should be reclassified as a sexually violent offender. The General Assembly’s decision was definitive, and it was final; no school board has the authority to overturn it.
Nonetheless, the majority appears to be operating under the misconception that the school board is properly the initial deci-sionmaker for purposes of our finality analysis. The majority’s assumption might be plausible were Ms. Doe to concede that she had been accurately reclassified as a violent offender and simply wished to litigate her eligibility for dispensation from the entry bar. The school board would be uniquely qualified to decide that particular issue, because it would possess institutional expertise on such matters as, for example, Ms. Doe’s reputation within the school community, the need for and adequacy of security on school grounds and at school events, and its past experiences in similar situations.
But Ms. Doe has not so conceded. She indeed advances a constitutional issue with respect to the procedure afforded by the school board, but that argument is made as an alternative in the event that we reject her primary contention that she was unconstitutionally reclassified. Put most simply, if Ms. Doe should not have been categorized as a sexually violent offender — which is exactly her claim — then the school board has no legally cognizable interest in her exclusion from school grounds, and no business in this case. At the end of the day, the majority simply cannot justify its decision to flout Supreme Court precedent.
II.
Having set forth the reasons why Ms. Doe’s appeal should be resolved by a pedestrian application of exhaustion (and, possibly, abstention) principles, I move on to addressing why this matter has nothing to do with justiciability, and specifically the doctrines of standing and ripeness. The majority properly notes that “[rjipeness analysis holds much in common with standing analysis,” ante at 758 n. 10 (citations omitted), but it is no Herculean feat to ascertain the salient distinction between the two:
When determining standing, a court asks whether these persons are the proper parties to bring the suit, thus focusing on the qualitative sufficiency of the injury and whether the complainant has personally suffered the harm.... When determining ripeness, a court asks *770 whether this is the correct time for' the complainant to bring the action.
Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1173-74 (11th Cir.2006) (citation and internal quotation marks omitted); see Texas v. United States, 497 F.3d 491 (5th Cir.2007) (“[Standing is concerned with whether a proper party is bringing suit, while ripeness is concerned with whether the suit is being brought at the proper time.” (citation omitted)).
A.
The majority acknowledges that if Ms. Doe were to first avail herself of the remedial options provided under state law, the second and third standing elements (traceability and redressability), together with the “ripeness concerns we have noted here[,] would be addressed.” Ante at 759. By conceding that her case could become ripe under certain circumstances, i.e., that the correct time may arrive whereby Ms. Doe can bring this action, the majority effectively concedes that she is a proper party and thus has standing.
The majority may have intended, however, to hang its hat on the first element of standing, that is, “the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted). If so, the majority is sorely in need of a different hook, because Ms. Doe has alleged that she is now prohibited from entering her stepson’s school to attend parent-teacher conferences and extracurricular activities, which means that her ability to offer meaningful input and support with respect to John Doe’s education is impaired, right now, at least to a degree. Moreover, Ms. Doe has contended that the defendants’ actions will result in the undesired homeschooling of her younger children, who, three years following the filing of the Complaint, are now of school age.
We know that the freedom to direct and control the education of one’s children is a constitutionally protected fundamental right, because the Supreme Court told us so — nearly a hundred years ago — in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Ms. Doe’s right in that regard, according to her Complaint, is currently being interfered with in a manner that she plausibly maintains violates the substantive due process protections of the Fourteenth Amendment. Moreover, a key component of the majority’s suggested remedy for the violation — petitioning the school board to lift the entry bar — is itself alleged to be injurious to the degree that Ms. Doe must reveal her identity as a condition of approach. How could there ever be a more plain statement of an actual, concrete injury in fact?
The injury-in-fact case primarily relied on by the majority fails to support its sweeping assertions. In Valero Terrestrial Corp. v. Paige, 211 F.3d 112 (4th Cir.2000), we concluded that the plaintiff waste disposal company possessed no standing to challenge a state statutory provision permitting a referendum on the creation of large dumpsites or the expansion of existing ones. Our decision was founded on the absence of any allegation that the plaintiff intended to build a qualifying site; we likewise deemed speculative the prospect that an expansion referendum would actually occur. The Valero plaintiff therefore lacked an injury in fact, which is certainly not the ease here. Every act necessary to inflict injury upon Ms. Doe has already happened: (1) she was reclassified as a violent offender; (2) one or more of her children began to attend school; and (3) *771 her ability to meaningfully interact with her children’s school environment has been encumbered by the reclassification. Having her petition denied by the state circuit court or the county school board would not injure her further; such an outcome would merely represent a withholding of relief for her injury.
Nor is it difficult to trace the source of Ms. Doe’s injury: the reclassification of her offense became effective on July 1, 2008, by virtue of the Commonwealth’s amendment of its statutory scheme relating to sex offenders.[4] There is, therefore, a direct link between the challenged enactment and the injury complained of. That direct link is missing in each of the traceability cases cited by the majority, distinguishing those authorities. See Allen v. Wright, 468 U.S. 737, 757-59, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (ruling that plaintiffs were without standing to sue Treasury Secretary and IRS Commissioner where complaint did not allege that general neglect to revoke tax-exempt status of racially discriminatory private schools had directly resulted in plaintiffs’ children being discriminated against); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 42-46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (directing dismissal of claims against Secretary and Commissioner where complaint alleged only that IRS Revenue Ruling encouraged hospitals generally to withhold indigent services, without asserting that plaintiffs had been denied treatment as a direct result); Mirant Potomac River, LLC v. EPA 577 F.3d 223, 229-30 (4th Cir.2009) (concluding that plaintiff lacked standing to challenge federal approval of state environmental compliance plan where alleged injury traceable instead to separate state regulatory scheme); Frank Krasner Enters., Ltd. v. Montgomery Cnty., Md., 401 F.3d 230, 235-36 (4th Cir.2005) (ascertaining that injury described in complaint was too indirect to confer standing where gun show promoter and gun exhibitor alleged county code amendment influenced third-party venue owner to cease leasing them space).
The majority fares no better on redress-ability. In both Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138 (4th Cir.2009), and Covenant Media of South Carolina, LLC v. City of North Charleston, 493 F.3d 421 (4th Cir.2007), on which the majority premises its reasoning, the futility of the sought-after judgments was evident. In Iota Xi, the plaintiffs contested certain university sanctions imposed upon their fraternity, some alleged to have been in violation of the First Amendment. We concluded that those free speech claims were incapable of redress, inasmuch as “other adequate grounds existed” justifying the sanctions. 566 F.3d at 148. Similarly, in Covenant Media, we deemed untenable a challenge to certain provisions of a city regulation governing billboard permits, because the permit at issue had also been denied on alternative, unchallenged grounds. See 493 F.3d at 429-30.
Ms. Doe, by contrast, seeks a simple declaration from a federal court that the Virginia statute reclassifying her carnal knowledge offense as sexually violent is unconstitutional as applied to her, insofar as it is insufficiently tailored to her circumstances and thereby impinges upon her substantive, fundamental right under the Due Process Clause of the Fourteenth *772 Amendment to educate her children in the manner she would prefer. On the merits of the issue, Ms. Doe either is or is not entitled to the relief she requests, depending on the facts of the case yet to be developed; there is no alternative ground whereby she may be denied her constitutional rights if she otherwise prevails. The opinion of the school board cannot alter Ms. Doe’s entitlement. The opinion of the state circuit court — having not been solicited — has no bearing upon the question.
A judgment from the district court in Ms. Doe’s favor would permit her the immediate liberty to enter her children’s schools without credible threat of prosecution, while also affording her the means to petition the circuit court to have her name removed from the offender registry. See Townes v. Jarvis, 577 F.3d 543, 548-49 (4th Cir.2009) (rejecting argument that plaintiffs habeas claim lacked redressability, in that federal judgment would provide immediate declaratory relief as an important precursor to subsequent state proceedings). Such an outcome would restore Ms. Doe to the position she enjoyed prior to the reclassification, and that is sufficient redress under the Constitution to confer standing. A return to normalcy is, from Ms. Doe’s perspective, the prize at the bottom of the Cracker Jack box.
B.
Given that Ms. Doe need petition neither the state circuit court nor the school board to begin with, her case at present is about as ripe as it is ever going to get. The majority’s insistence that Ms. Doe submit to an irrelevant state administrative procedure will, if anything, risk the dispute becoming overripe. Even if the school board grants Ms. Doe permission to enter school property, she will still be legally designated a violent sexual offender, and she will yet be compelled to continue registering with the State Police for the rest of her life, with no hope of cessation.
But even under the majority’s analysis of ripeness, as to which it employs the traditional framework established by our precedents, a voluntary petition before the school board is not a proper contingency that must be resolved as a condition to suit. The issue of ripeness was only indirectly before us in Franks v. Ross, 313 F.3d 184 (4th Cir.2002), a landfill siting dispute, but it was nonetheless a key component in determining whether the plaintiffs’ claims had been filed within the applicable limitations period. We ascertained that the time for filing suit had not ripened until the permitting agency had “conclude[d] the decisionmaking process on the project.” Id. at 195-96; accord Charter Fed. Sav. Bank v. Office of Thrift Supervision, 976 F.2d 203, 209 (4th Cir.1992) (deeming plaintiff bank’s claims against FDIC unripe where agency had not been appointed bank’s conservator or receiver, and where agency was required to complete administrative process prior to taking final, definitive action of terminating bank’s status as insured depository). Ms. Doe’s dispute is not with an administrative agency — here, the school board. She is awaiting no final decision affecting her rights. To the contrary, her rights were affected with finality on July 1, 2008, when the amendments to the Commonwealth’s sexual offender statutory scheme took effect, as passed by the Virginia General Assembly.
In determining ripeness, “we balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.” Miller v. Brown, 462 F.3d 312, 319 (4th Cir.2006) (citation and internal quotation marks omitted). The fitness prong is fulfilled “when the issues are purely legal and *773 when the action in controversy is final and not dependent on future uncertainties.” Id. at 319 (citing Charter Fed. Sav. Bank, 976 F.2d at 208). On the other side of the equation, “ ‘[t]he hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiffs.’ ” Id. (alteration omitted) (quoting Charter Fed. Sav. Bank, 976 F.2d at 208-09).
This case presents the “purely legal” issue of whether the final action of the Commonwealth of Virginia, as applied to Ms. Doe’s situation, contravenes her due process guaranty under the Constitution. The threat to the liberty interest asserted by Ms. Doe in participating in her children’s education is immediate and ongoing, and, she alleges, oppressive. It is simply beyond cavil that Ms. Doe’s substantive due process claim is ripe for adjudication. I would vacate the judgment below and remand for discovery on that claim.[5]
III.
I must admit that I am nonplused— floored, even — that we would turn away someone in Ms. Doe’s position, straining to forgo involvement for the nonce, while affording precious little hope for the future that her modest request for federal adjudication of a federal constitutional claim will be fulfilled. I fully appreciate that, twenty years ago now, Ms. Doe engaged in a serious offense, though, as the district court mused, she “seems to have maybe not committed the worst sex crime in the world.” Transcript of May 12, 2011 Motions Hearing at 54 (J.A. 184). Nonetheless, Ms. Doe is a proper party — perhaps the archetypical party — to bring a suit of this nature. Moreover, the time for litigation is plainly now, and not after precious years have slipped away as Ms. Doe’s children advance through the elementary and middle-school grades.
By refusing to insist that this case be decided in a federal forum, the majority stands one hundred eighty degrees from Supreme Court precedent, effectively abandoning our constitutional mandate. Our decision today will inevitably rain chaos down upon our previously settled jurisprudence governing standing and ripeness.[6] I do not think it an overlong stretch to predict that we will now stand alone among the circuits as the court that has abdicated its “province and duty ... to say what the law is.” Marbury v. Madison, *774 5 U.S. 137, 1 Cranch 137, 177, 2 L.Ed. 60 (1803).
I emphatically and wholeheartedly dissent.

. The majority’s failure to properly compartmentalize Ms. Doe’s claims, and to associate therewith the particular statute to which each relates, is manifest in my good colleague’s concurring opinion. The concurrence-scolds Ms. Doe for not pursuing the avenues of relief from the entry bar "provided under the very law she challenges.” Ante at 761 (Keenan, J., concurring). These avenues of redress before the circuit court and the county school board are spelled out in Virginia Code section 18.2-370.5. But, more fundamentally, Ms. Doe also challenges her reclassification pursuant to Virginia Code section 9.1-902(E)(1). There is no avenue of redress in the reclassification statute; thus, the only way Ms. Doe can avoid its effects is to obtain a court injunction. Consequently, the concurrence misses the mark by maintaining that "the question whether [Ms. Doe] suffers from any injury at all depends on the manner in which Section 18.2-370.5 applies to the facts and circumstances of her case.” Id. at 761. To the contrary, the nature and extent of Ms. Doe's injury more proximately depends on the applicability of section 9.1-902(E)(1). Because a ruling in Ms. Doe's favor on her substantive due process claim stemming from her reclassification would moot the need for redress under section 18.2-370.5, the concurrence’s protestations as to an underdeveloped factual record on Ms. Doe's procedural due process claim, see id. at 761-62, relating primarily to the latter statute, are quite beside the point.

. Patsy similarly does not apply where Congress has explicitly or implicitly provided for the exhaustion of state administrative remedies as a prerequisite to suit in federal court. See Talbot v. Lucy Corr Nursing Home, 118 F.3d 215, 219 (4th Cir.1997). Congress's intent in this regard may be discerned as implicit whenever it "may be fairly understood from congressional action.” Id. (citations and internal quotation marks omitted). Importantly, "[i]f there is doubt as to whether an exception applies, courts should refrain from requiring exhaustion in § 1983 suits because Patsy leaves no doubt that the presumption is strongly in favor of no exception.” Id. (citation and internal quotation marks omitted).

. As the majority discerns, the requirement of finality, front and center in Williamson County, is distinguishable from that of exhaustion, around which Patsy revolved. Exhaustion " 'generally refers to administrative and judicial procedures by which an injured party may seek review of an administrative decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.’ ” Ante at 754 n. 5 (quoting Williamson Cnty., 473 U.S. at 193, 105 S.Ct. 3108). Thus, in Williamson County, the Supreme Court concluded that a planning commission’s refusal to approve a preliminary plat was not a final decision, in that the developer had not followed through with the commission to request variances from the applicable zoning regulations. See 473 U.S. at 193-94, 105 S.Ct. 3108. The Court contrasted that situation with the review procedures provided by the state in the event that the variances were denied, holding that "those procedures clearly are remedial,” and if invoked "would result in a judgment whether the Commission’s actions violated any of respondent’s rights.” Id. at 193, 105 S.Ct. 3108. As such, the respondent in Williamson County "would not be required to resort to those procedures before bringing its § 1983 action.” Id.
The school board petition that the Commonwealth provides to persons deemed sexually violent offenders is a remedial measure, designed to afford relief from draconian applications of the entry bar. It is just the sort of recourse that Williamson County confirms need not be exhausted as a predicate to federal litigation. Perhaps more importantly, Williamson County involved a Fifth Amendment takings claim, which is a special type of civil rights action, one in which "no constitutional violation occurs until just compensation [by the state] has been denied.” Williamson County, 473 U.S. at 194 n. 13, 105 S.Ct. 3108. Hence, "the nature of the constitutional right ... requires that a property owner utilize [state] procedures for obtaining compensation before bringing a § 1983 action.” Id.; see Daniels v. Area Plan Comm'n of Allen Cnty., 306 F.3d 445, 453 (7th Cir.2002) (recognizing *769 that "the additional ripeness requirements of Williamson County create a takings claim exception to Patsy's general requirement that exhaustion is not required in § 1983 suits”). No such exception exists with respect to claims alleging due process violations. See Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal, Va., 135 F.3d 275, 283 n. 3 (4th Cir.1998) (noting absence of concern whether plaintiff’s "Fourteenth Amendment due process and equal protection claims are ripe,” because “[s]tate remedies need not be exhausted in order to pursue a § 1983 action claiming a violation of these federal rights” (citing Patsy)).

. The legislators of the Commonwealth are, of course, immune from suit under § 1983, see Whitener v. McWatters, 112 F.3d 740, 742 (4th Cir.1997), with the result that the official ultimately responsible for enforcing the relevant statutes — Colonel W. Stephen Flaherty, Superintendent of the Virginia Department of State Police — is the appropriate stand-in, and he is, in fact, a named defendant.

. Because Ms. Doe would obtain all the relief she seeks were she to prevail on her substantive due process claim, I take no position as to the majority’s disposition of her remaining claims.

. One may well suppose that the majority’s groundbreaking decision in this case will serve to block immediate federal court access for plaintiffs seeking to vindicate the full panoply of rights afforded under the Constitution and laws of the United States. Such claims might include, by way of example, the extent of the individual right to bear arms under the Second Amendment, see Durga v. Bryan, No. 3:10-cv-1989, 2011 WL 4594281 at *6 (D.N.J. Sept. 30, 2011) (unpublished) (observing in § 1983 action that defendants "present no arguments to support that the Firearms License application and subsequent appeal constitute a coercive proceeding that requires exhaustion”); the right of racial minorities to be free from discrimination in employment, see Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 334 (4th Cir.1983) (recognizing previously settled rule that, as to discrimination "claims brought under 42 U.S.C. § 1981, exhaustion of EEOC remedies is not a prerequisite to filing suit”); or the right of disabled children to a free, appropriate public education, see Barron ex rel. D.B. v. S.D. Bd. of Regents, 655 F.3d 787, 792 (8th Cir.2011) (concluding that, in suit brought pursuant to § 1983 to enjoin closing of school for deaf children, "the parents were not required to exhaust because, if their position was well founded and the Board’s actions violated the IDEA, adequate relief likely could not have been obtained through the administrative process”).